UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

DEVONSHIRE REAL ESTATE &      §
ASSET MANAGEMENT, LP,         §
                             §
   Plaintiff,  §
                             §
v.                           §    CIVIL ACTION NO. 3:12-CV-2199-B
                             §
AMERICAN INSURANCE           §
COMPANY,                     §
                             §
   Defendant.  §

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendant American Insurance Company's and Plaintiff Devonshire

Real Estate & Asset Management, LP's Cross Motions for Partial Summary Judgment, both filed on

January 27, 2014. Docs. 93, 94. For the reasons that follow, Defendant's Motion is **GRANTED**, and

Plaintiff's Motion is **GRANTED in part**, and **DENIED in part**.

## I.

## BACKGROUND[1]

*A. Overview*

This case arises out of a dispute over the amount owed on several insurance claims submitted

by Plaintiff Devonshire Real Estate & Asset Management, LP ("Devonshire") to Defendant

American Insurance Company ("American") under a commercial property insurance policy.

Devonshire first submitted a claim under this policy in May 2011 after a commercial apartment

---

[1] The Court takes its factual account from the uncontested facts contained in the summary judgment record. Any contested fact is identified as the allegation of a particular party.

complex it owns was damaged in a wind and hailstorm. In August and October of that year, American made partial payments of this claim to Devonshire. In March 2012, Devonshire submitted a supplemental claim for damage to an ice and water shield. American fully settled both of these claims in April 2012.

In May 2012, Devonshire submitted a second supplemental claim for damage to certain metal carport roofs, gutters, and downspouts. American refused to pay this supplemental claim, but invited Devonshire to proceed to appraisal. Instead, Devonshire filed this suit, alleging claims for breach of contract, breach of the duty of good faith and fair dealing, violations of Chapter 541 of the Texas Insurance Code and Deceptive Trade Practices Act, and violations of the prompt payment provisions of the Insurance Code.

Shortly after litigation commenced, American demanded appraisal of Devonshire's second supplemental claim as provided for by the parties' insurance policy. On July 24, 2013, the parties' respective appraisers agreed to an award with a replacement cost value of $220,725.19, and an actual cash value of $198,308.13, less prior payments. On July 31, 2013, American issued a check to Devonshire for $66,905.32, the amount American believed it owed under the appraisal award after various deductions and adjustments. The parties dispute whether this payment fully satisfied the appraisal award. In particular, they disagree as to whether payment should have been made on a replacement cost or actual cash value basis, the amount of prior payments on the claim, and whether American was entitled to deduct from its payment an amount equal to its alleged prior overpayment of Devonshire's claim for damage to the ice and water shield.

These facts are outlined in detail, below.

B. *Devonshire's Initial Claim and Supplemental Claim for Damage to the Ice and Water Shield*

On or about May 2011, Plaintiff Devonshire Real Estate & Asset Management, LP, ("Devonshire") purchased a commercial property insurance policy, No. S 67 MXF 80466440 (the "Policy"), from Defendant American Insurance Company ("American") to cover certain risks for its Burn Brae Apartments property in Irving, Texas (the "Property" or "Apartments"). Doc. 17, Am. Compl. ¶ 5. Devonshire alleges that on May 24, 2011, the Property sustained extensive damage to its roof, chimney, carports, and windows from wind and hail. *Id.* On or about May 25, 2011, Devonshire reported this damage to American. Docs. 17, Am. Compl. ¶ 5; 33, Am. Answer ¶ 5; 93-7, Ex. B-1, First Notice of Loss Snapshot Report. In May and June of 2011, American's adjuster, Kenneth Bourque, investigated the damage to the Apartments and estimated that the replacement cost value of the loss was $391,485.93. Docs. 17, Am. Compl. ¶ 6; 3, Am. Answer ¶ 6. After subtracting $99,247.01 for depreciation and $155,841.17 for Devonshire's deductible, Bourque concluded that the actual cash value of Devonshire's claim was $136,397.75. *Id.* On August 15, 2011, American issued a check to Devonshire for that amount. Docs. 17, Am. Compl. ¶ 6; 33, Am. Answer ¶ 6; 95, Ex. B, Check from American.

Dissatisfied with Bourque's estimate, Devonshire hired Gary Pennington, a Texas licensed public adjuster, to present a claim on the Apartments. Docs. 17, Am. Compl. ¶ 7; 33, Am. Answer ¶ 7. Pennington estimated that the cost to repair the damage to the Apartments was $764,987.37. *Id.*; *see also* doc. 18-2, Loree Letter. Devonshire submitted Pennington's estimate to American on September 5, 2011. *Id.* On October 14, 2011, after further discussions between Devonshire's and American's respective adjusters, American issued Devonshire another check in the amount of $178,588.50. Docs. 17, Am. Compl. ¶ 6; 33, Am. Answer ¶¶ 6, 8.

Thereafter, American decided to hire Aaron McKinney of Belfor Property Restoration to complete an independent estimate of the damage to the Apartments. Docs. 17, Am. Compl. ¶ 9; 33, Am. Answer ¶ 9. On November 2, 2011, McKinney returned an estimate of $610,177.19 based on the replacement cost value of the loss.  Docs. 17, Am. Compl. ¶ 9;  33, Am. Answer ¶ 9;  *see also* doc. 95, Belfor Estimate Ex. D. Around that same time, Devonshire received and submitted to American an estimate from its contractor Smart Roofing & Restoration that it would cost $715,662.47 to repair the Apartments. Docs. 17, Am. Compl. ¶ 10;  33, Am. Answer ¶ 10; *see also* doc. 95, Ex. C, Smart Roofing Contract. Devonshire's President, John Redden, then sent a letter to American in which he reported Smart Roofing's estimate and, after applying a deductible of $155,841.17, adding a glass repair of $10,008.06, and subtracting $314,653.25 for prior payments, demanded an additional $99,316.16 to cover the loss to the Apartments. Docs. 17, Am. Compl. ¶ 10;  33, Am. Answer ¶ 10.

Several months later, on February 28, 2012, Laurie Stover, the Regional General Adjuster for American, emailed Devonshire to indicate that American was prepared to settle the claim based on the Smart Roofing estimate of $715,662.47, plus an additional $10,008.06 for out-of-pocket repairs. Doc. 95, Ex. E, Stover Email. Instead, on or about March 1, 2012, Devonshire submitted a supplemental claim for damage to an ice and water shield in the amount of $49,253.61. Doc. 95, Ex. F, Pennington Email. American later paid $304,096.72 to Devonshire on April 10, 2012. Docs. 17, Am. Compl. ¶ 9;  33, Am. Answer ¶ 11; 95, Ex. A-5, Check from American. This amount included payment for the cost of replacing the ice and water shield. Doc. 95, Ex. A-1, Stover Email. Devonshire, however, has yet to actually replace the shield. Docs. 83-1, Aff. of Perry Little 1–2; 96, Pl.'s Resp. Br. 14–15.

C. *Devonshire's Supplemental Claim for Damage to the Carports, Gutters, and Downspouts*

On May 10, 2012, Devonshire again submitted a supplemental claim, this time for damage to certain gutters, downspouts, and carports in the amount of $90,938.81. Docs. 17, Am. Compl. ¶ 12; 33, Am. Answer ¶ 12; 95, Ex. G, Pennington Email. In response to this second supplemental claim, Stover indicated that American would not pay any supplements for additional damages to gutters or metal roofing and invited Devonshire to proceed to appraisal if it wished. Doc. 18-3, Ex. C, Stover Email. Instead, on June 6, 2012, Devonshire filed this action against American in state court, alleging claims for breach of contract, breach of the duty of good faith and fair dealing, violations of the Texas Insurance Code, and violations of the Texas Deceptive Trade Practices Act. Doc. 1-5, Pl.'s Orig. Compl. American removed the case to federal court on July 10, 2012. Doc. 1, Not. of Removal.

D. *The Appraisal*

On November 29, 2012, several months after commencement of this litigation, Devonshire increased its claimed damages from $90,938.81 to $164,637.21. Docs. 17, Am. Compl. ¶ 12; 95, Ex. H, Statement of Loss. Shortly thereafter, American filed a motion seeking to compel Devonshire to participate in the appraisal process to determine the amount of loss on the Property and to abate litigation while the appraisal was underway. Doc. 18. The Court granted this motion in part on March 26, 2013 and ordered Devonshire to submit its claim for damage to the carports, gutters, and downspouts to appraisal. Doc. 35.

The parties' appointed appraisers subsequently inspected the Property and on July 24, 2013, agreed to an appraisal award with a replacement cost value of $220,725.19, and an actual cash value

of $198,308.13, less prior payments. Doc. 73-1, Ex. A, Marshall Letter and Appraisal Award.[2] On July 31, 2013, after deducting prior payments for the carports, gutters, and downspouts, applying an offset for its alleged overpayment of Devonshire's claim for damage to the ice and water shield, and adding an unpaid cost not addressed by the appraisal, American issued a check to Devonshire for $66,905.32. Doc. 73-1, Ex. C, Loree Letter.

On the eve of the scheduled trial date, the parties had not filed dispositive motions in this case and, as evidenced by their Joint Pretrial Order, doc. 76, and other recently submitted briefing, docs. 71; 73, still parted ways on significant questions of law that were integral to a clear disposition of the case. Accordingly, the Court vacated the established trial date and ordered the parties to file cross motions for summary judgment on certain outstanding issues contained in their pre-trial briefing. These cross motions are now ripe for review.

## II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law governing a matter determines which facts are material to a case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The summary judgment movant bears the burden of proving that no genuine issue of

---

[2] The parties disagree over the proper amount of prior payments that must be deducted from the appraisal award. Doc. 92, Order 2–3. Devonshire insists that the appraisal award, less prior payments, is $114,638.30, while American contends that it is only $112,329.20. *Id.* The Court determined in its December 26, 2013 Order that, under the parties' insurance agreement, the appraisers were required to determine the total sum of the damages caused to the Apartments and nothing else. *Id.* at 6. Because neither party has submitted evidence as to the proper amount of the prior payments here, a fact issue remains as to this issue.

material fact exists. *Latimer v. Smithkline & French Labs*, 919 F.2d 301, 303 (5th Cir. 1990). However, if the non-movant ultimately bears the burden of proof at trial, the summary judgment movant may satisfy its burden by pointing to the mere absence of evidence supporting the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once the summary judgment movant has met this burden, the non-movant must "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citing *Celotex*, 477 U.S. at 325). In determining whether a genuine issue exists for trial, the court will view all of the evidence in the light most favorable to the non-movant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000). But the non-movant must produce more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the non-movant is unable to make such a showing, the court must grant summary judgment. *Little*, 37 F.3d at 1076.

## III.

## ANALYSIS

American moves for summary judgment on several issues and claims, including: (1) whether it was entitled to deduct from its payment of the appraisal award an amount equal to its prior overpayment of Devonshire's claim for damage to the ice and water shield; (2) Devonshire's claims for breach of the duty of good faith and fair dealing and exemplary damages; and (3) Devonshire's claims for violations of Chapter 541 of the Texas Insurance Code and Deceptive Trade Practices Act.

Devonshire objects to American's motion and cross moves for summary judgment on its claims that (1) American breached the subject insurance policy when it failed to pay Devonshire's

supplemental claim for damages to the carports, gutters, and downspouts; and (2) American violated Chapter 542 of the Texas Insurance Code when it failed to timely accept and pay Devonshire's initial claim for damages, entitling Devonshire to statutory damages and attorney's fees under Section 542.060 of that Chapter.

In addition, both parties move for summary judgment on the issue of whether replacement cost or actual cash value is the proper measure of damages in this suit. Because this issue impacts the Court's analysis of Devonshire's breach of contract and other claims, the Court addresses this issue first. The Court then proceeds to address each of the parties' requests, in turn.

A. *Replacement Cost Value or Actual Cash Value*

Both parties move for summary judgment as to whether replacement cost value or actual cash value is the proper measure of damages in this suit. American insists that it is entitled to summary judgment that actual cash value is the proper measure of damages because the parties' insurance policy expressly provides that American will not pay on a replacement cost basis for any loss or damage "[u]ntil the lost or damaged property is actually repaired or replaced" and Devonshire has not completed all necessary repairs. Doc. 94, Def.'s Br. 5–6; *see* doc. 96-2, Ex. A-1, Policy Form ¶ G(3)(d). Pointing to other Texas cases that have construed nearly identical language in other insurance policies, American argues that the Policy, by its terms, requires actual repair or replacement as a precondition to recovery on a replacement cost basis. Doc. 94, Def.'s Br. 7–8. Devonshire acknowledges that it has not completed repairs,[3] docs. 83-

---

[3] Devonshire claims that it has completed 90% of repairs on the damaged property, although how Devonshire arrived at this figure is unclear. Doc. 96, Pl.'s Resp. Br. 3. The only evidence it offers to support this number is an affidavit from Perry Little, the contractor hired to make the repairs to Devonshire's property, in which Mr. Little outlines the repairs he has made to date and the repairs that have yet to be completed,

1, Aff. of Perry Little 1–2; 96, Pl.'s Resp. Br. 3, but offers no legal authority of its own to support an

alternative construction of the Policy.[4] Instead, Devonshire raises a number of extra-contractual

grounds why, regardless of whether it has completed repairs, it is entitled to recover replacement

costs. Doc. 96, Pl.'s Resp. Br. 3–14. For the reasons that follow, the Court finds that actual cash

value is the proper measure of damages in this suit.

In order to determine whether replacement cost or actual cash value is the proper measure

of damages under the parties' contract, the Court must interpret the Policy's terms. "Texas courts

interpret insurance policies according to the rules of contract interpretation." *Vought Aircraft Indus.,*

*Inc. v. Falvey Cargo Underwriting, LTD.*, 729 F. Supp. 2d 814, 823 (N.D. Tex. 2010). When

construing a contract, a court's primary concern is to "ascertain the true intentions of the parties

as expressed in the instrument." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005).

Terms will be given their "plain, ordinary, and generally accepted meanings unless the contract itself

shows them to be used in a technical or different sense." *Id.* In order to ascertain the parties' true

intentions, courts will consider the entire writing in order to give effect to all of its provisions and

so that none will be rendered meaningless. *Id.*; *see also FPL Energy, LLC v. TXU Portfolio Mgmt. Co.,*

*L.P.*, 426 S.W.3d 59, 63 (Tex. 2014).

Here, the plain language of the parties' contract dictates that Devonshire may only recover

on a replacement cost basis *after* it has completed repairs. As both parties note, while the Policy itself

---

including installation of the ice and water shield and repair of the damaged gutters. Doc. 83-1, Aff. of Perry
Little 1–2.

[4] Devonshire cites three Texas cases holding that replacement costs are the proper measure of
damages, but fails to explain how these cases pertain to the policy provisions at issue in this case. Doc. 96, Pl.'s
Resp. 2.

generally provides that the value of the damaged property be determined on an actual cash value basis, Devonshire purchased optional replacement cost coverage permitting it to request and receive replacement costs. Doc. 96-2, Ex. A-1 , Policy Form ¶ G(3)(a). Specifically, the coverage provides:

> You [Devonshire] may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us [American] of your intent to do so within 180 days after the loss or damage.

*Id.* A-1 ¶ G(3)(c).

As at least one federal court has determined in construing an identical provision in a commercial loss policy, "[t]his language is clear and unambiguous. It allows the insured to either make a claim for replacement costs, up to the policy limits, or actual cash value supplemented by additional replacement cost coverage." *Ghoman v. New Hampshire Ins. Co.*, 159 F. Supp. 2d 928, 932 (N.D. Tex. 2001). Standing alone, then, this provision would seem to indicate that Devonshire simply needs to elect to receive damages on a replacement cost basis and American must pay the same.

A separate provision of Devonshire's optional coverage, however, explicitly restricts Devonshire's ability to recover on a replacement cost basis. That provision provides that American "will not pay on a replacement cost basis for any loss or damage: (1) Until the lost or damaged property is actually repaired or replaced; and (2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage." Doc. 96-2, Ex. A-1 , Policy Form ¶ G(3)(d). The plain import of this passage is that while Devonshire may elect to recover on a replacement cost basis, it may only do so once it has repaired or replaced the lost or damaged property. *See Ghoman*, 159 F. Supp. 2d at 932 ("Obviously, an insured cannot recover repair or replacement costs unless

and until he actually repairs or replaces the insured structure."); *O'Quinn v. General Star Indem. Co.*, No. 1:13-CV-0471, 2014 WL 3974315, at *6 (E.D. Tex. Aug. 5, 2014); *Fitzhugh 25 Partners, L.P. v. KILN Syndicate KLN 501*, 261 S.W.3d 861, 863 (Tex. App.—Dallas 2008, pet. denied) ("[C]ourts across the country that have considered the meaning of the same or similar language in a property insurance policy have universally held that such language requires repair or replacement of the destroyed property before the insured is entitled to recover replacement cost damages.").[5]

Despite the plain meaning of the Policy's terms, as well as the substantial case law supporting American's interpretation of the optional coverage provisions, Devonshire insists that it may elect to recover on a replacement cost value basis regardless of whether it replaced the damaged property and raises a number of extra-contractual arguments why this is so. Doc. 96, Pl.'s Resp. Br. 2–14. As explained below none of these arguments are convincing.

First, Devonshire argues that the aforementioned cases are distinguishable on factual grounds and thus not controlling in this case. Doc. 96, Pl.'s Resp. Br. 4–7. For example, Devonshire points out that in *Ghoman*, the dispute centered on whether the insured had properly made an actual cash value claim under an optional coverage provision identical to the one at issue in this case; and not whether, as here, the insured could claim replacement costs under the provision. 159 F. Supp. 2d

---

[5] Alternatively, Devonshire may elect to receive funds through the two-step process outlined in Paragraph G(3)(c) of its optional replacement cost coverage, by first making a claim on an actual cash basis, and then later submitting an additional claim for any repair costs that it incurred in excess of the actual cash value already paid. *See supra* p. 10; Doc. 96-2, Ex. A-1, Policy Form ¶ G(3)(a). Devonshire may not, however, by the terms of the Policy, make a claim for loss on a replacement cost basis without first repairing or replacing the damaged property.

at 933–34. Similarly, Devonshire observes that in *Fitzhugh*, unlike in the present case, the insured attempted to replace a damaged apartment complex by purchasing an interest in a different property altogether, and the issue was whether this purchase was sufficient to trigger the insurer's obligation to pay replacement costs under the parties' policy. 261 S.W.3d at 862, 864–65.[6] Devonshire fails to show (and the Court fails to see), however, how the unique factual circumstances of these cases affected either court's interpretation of the respective policy provisions at issue in those cases, which both courts construed as providing for replacement costs only *after* the insured had completed all necessary repairs or replacements. Absent such a showing, the Court sees no reason why it should not rely on their decisions in construing the nearly identical policy provisions at issue here.

Second, relying on a January 12, 2012 email from American's adjuster, Laurie Stover, to Gary Pennington, Devonshire's adjuster, Devonshire argues that it was only required to complete 50% of repairs in order to receive replacement costs, which it maintains it did.[7] Doc. 96, Pl.'s Resp. Br. 3; Ex. B-2, Stover Email. In that email, Ms. Stover offered to settle Devonshire's entire claim, but indicated that American's release of the holdback amount (i.e, the difference between the replacement cost value and actual cost value or the depreciation value) was contingent on repairs being "50% or more completed with proof of payments made and a contract for repairs sent to this adjuster." Doc. 96-5, Ex. B-2, Stover Email. Devonshire rejected this settlement offer, however, and has provided no legal authority to suggest that such an offer, standing alone, was sufficient to unilaterally modify the terms of the Policy. Doc. 96, Ex. B-2, Pennington Email.

---

[6] Devonshire does not address the *O'Quinn* decision in its briefing. 2014 WL 3974315, at *6.

[7] Since Devonshire is effectively arguing that Ms. Stover's email amounted to a modification of the parties' contract or an accord, the Court need not worry that it is considering extrinsic evidence of the contract's original terms.

Third, Devonshire contends that as a matter of policy, were the Court to adopt American's interpretation of the Policy provisions, Devonshire may be forced to file a new suit in order to recover replacement costs, which may be barred by collateral estoppel, res judicata, or the applicable statute of limitations. Doc. 96, Pl.'s Resp. Br. 7–8. This argument makes little sense, however, because the Policy's two-step process already provides a way for Devonshire to recover replacement costs once it has completed all necessary repairs without having to file a new suit. *See supra* p. 10. But even if Devonshire did need to file another suit to recover replacement costs, whether it would be barred from doing so by collateral estoppel, res judicata, or limitations is not an issue presently before the Court. Nor has Devonshire provided the Court with any authority to warrant rewriting an otherwise unambiguous contract based on the mere possibility that Devonshire could be precluded from filing a new suit to recover replacement costs some time in the future.

Fourth, Devonshire argues that the equitable "doctrine of prevention" relieves it of the obligation to make repairs before receiving replacement costs, because American's refusal to pay Devonshire the actual cash value of its second supplemental claim for damage to the carport roofs, gutters, and downspouts prevented Devonshire from completing the necessary repairs. Doc. 96, Pl.'s Resp. Br. 12. Under that doctrine, "when a promisor wrongfully prevents a condition from occurring that condition is excused." *Mendoza v. COMSAT Corp.*, 201 F.3d 626, 631 (5th Cir. 2000). As American correctly observes, however, no Texas court has employed the doctrine of prevention to vitiate an insured's contractual obligation to repair or replace damaged property before claiming payment for replacement costs. Moreover, in cases where the doctrine has been applied to allow an insured to recover replacement costs, the insurer either completely denied the claim or refused to make any payments until it was too late for the insured, who was frequently an unsophisticated party,

to make repairs. *See e.g.*, *Rockford Mut. Ins. Co. v. Pirtle*, 911 N.E.2d 60, 64–65 (Ind. Ct. App. 2009) (applying doctrine where insurer refused to pay benefits until after mortgage foreclosure process had started and city condemned insured's property); *Pollock v. Fire Ins. Exch.*, 423 N.W.2d 234–35, 237 (Mich. Ct. App. 1988) (permitting recovery of replacement costs where insurer failed to make substantial payment before insured's home was demolished, refused to deal with insured before she contacted attorney, failed to appoint appraiser, and forced insured to bring lawsuit); *Zaitchick v. Am. Mot. Ins. Co.*, 554 F. Supp. 209, 216–17 (S.D.N.Y. 1982) (estopping insurer from requiring insured to repair property where property was a personal residence, insured was an elderly school teacher, and insurer refused to make any payments). By contrast, courts have refused to extend the doctrine where the insurer already paid the insured actual cash value or where the dispute took place in a commercial setting and involved relatively sophisticated parties. *See e.g.*, *Md. Cas. Co. v. Knight*, 96 F.3d 1284, 1292 (9th Cir. 1996) (holding that insurer was not estopped from requiring insured to replace damaged building before receiving replacement costs where insurer paid the insured the actual cash value of its claim); *Dickler v. CIGNA Prop. & Cas. Co.*, 957 F.2d 1088, 1096 (3d Cir. 1992) (refusing to relieve a real estate group of its duty to rebuild a burned down school before claiming replacement costs from insurer, because dispute occurred in a commercial context and involved relatively sophisticated parties).

In this case, both American and Devonshire are relatively sophisticated parties and the dispute is a commercial one. American has paid Devonshire over $620,000 to date with which to make repairs,  Docs. 17, Am. Compl. ¶¶ 6, 8–9;  33, Am. Answer ¶¶ 6, 8, 11; 95, Ex. A-5, Check from American, Ex. B, Check from American, and Devonshire has acknowledged, through its contractor, that repairs are still capable of being performed. Doc. 83-1, Aff. of Perry Little 1–2.

Moreover, although American denied Devonshire's second supplemental claim for damage to certain carports, gutters, and downspouts, Devonshire could have demanded an appraisal in order to obtain the monies it needed to complete the remaining repairs but chose to file suit instead. Docs. 96-2, Ex. A-1, Policy Form ¶ E(2); 18-3, Ex. C, Stover Email. In the absence of Texas authority, such equities do not merit extending the doctrine to relieve Devonshire of its contractual obligation to make repairs before receiving replacement costs.

Devonshire's final reason for arguing that it is entitled to replacement costs regardless of whether it completed repairs is that such a requirement constitutes a limitation on Devonshire's recovery that American waived by failing to plead as an affirmative defense. Doc. 96, Pl.'s Resp. Br. 8–12. American responds by noting that the Policy provision requiring Devonshire to make repairs before receiving replacement costs is a substantive damages provision and not an affirmative defense that American was required to affirmatively plead, or else waive. Docs. 94, Def.'s Br. 10; 100, Def.'s Reply Br. 7.

The Court need not decide who has the better of this argument, however, because even if the provision does establish a limitation on recovery that must be affirmatively pleaded, American pleaded the limitation at the most appropriate time possible. Under Federal Rule of Civil Procedure 8©, "when responding to a pleading, a party must, affirmatively state any avoidance or affirmative defense, including . . . estoppel." Fed. R. Civ. P. 8©. Failure to plead an affirmative defense may result in waiver. *McDaniel v. IntegraCare Holdings, Inc.*, 901 F. Supp. 2d 863, 868 (N.D. Tex. 2012). That said, "technical failure to comply precisely with Rule 8(c) is not fatal" so long as the defendant raised the defense "at a pragmatically sufficient time, and the plaintiff was not prejudiced in its ability to respond," *Lucas v. U.S.*, 807 F.2d 414, 417 (5th Cir. 1986) (citations omitted). "The prejudice

inquiry considers whether the plaintiff had sufficient notice to prepare for and contest the defense, and not simply whether the defense, and evidence in support of it, were detrimental to the plaintiff." *McDaniel*, 901 F. Supp. 2d at 868 (citing *Rogers v. McDorman*, 521 F.3d 381, 387 (5th Cir. 2008)).

Here, although American only raised the argument that Devonshire must actually repair the damaged property before recovering on a replacement cost basis shortly before trial, *see* doc. 76, Joint Pretrial Order 8, it did so at a pragmatically sufficient time. In fact, American could not have raised the defense at an earlier time because Devonshire first claimed that it was entitled to recover on a replacement cost basis in its pretrial order. *Id.* at 2. Moreover, given the plain terms of Devonshire's replacement cost coverage and its communications with American's adjusters, such a defense should not have come as a surprise to Devonshire or prejudiced its ability to respond. Doc. 96-2, Ex. A-1, Policy Form ¶ G(3)(d), Ex. B-2, Stover Email.

In sum, the Court concludes, based on the record evidence and the applicable authority, that the parties' policy unambiguously requires Devonshire to make actual repairs and replacements before claiming replacement costs. Because Devonshire acknowledges that it has not completed all necessary repairs on the carports, gutters, and downspouts, and has given the Court no authority on which to base an alternative interpretation, the Court holds that American is entitled to summary judgment that actual cash value is the proper measure of damages in this case.

B. *Offset for American's Overpayment of the Ice and Water Shield*

American next moves for summary judgment on the issue of whether it was entitled to offset from its payment of the appraisal award an amount equal to its overpayment of Devonshire's claim for damage to an ice and water shield. American alleges that it previously paid Devonshire the cost of installing a replacement shield based on Devonshire's representation that the shield had been

replaced when, in fact, it had not. Doc. 94, Def.'s Br. 13–14. As such, American contends that it was entitled to deduct from its payment of the appraisal award an amount equal to its overpayment. Doc. 94, Def.'s Br. 14.

Devonshire does not dispute that it has not yet replaced the ice and water shield, but nonetheless argues that American was not entitled to the offset because American's adjuster agreed to pay the full cost of replacing the shield despite knowing that the shield had not yet been replaced. Doc. 96, Pl.'s Resp. Br. 14–15. Further, even if this were not so, Devonshire maintains that American waived any right to an offset by failing to plead it as an affirmative defense. Doc. 96, Pl.'s Resp. Br. 17–18. For the reasons that follow, the Court finds that American was entitled to an offset.[8]

As discussed above, the parties' insurance policy clearly provides that Devonshire may only recover for damaged property on a replacement cost basis after it has completed all necessary repairs or replacements to such property. *See supra* pp. 8–11; Doc. 96-2, Ex. B-1, Policy Form ¶ G(3)(d). Until such repairs or replacements have been made, American is only obliged to pay Devonshire the actual cash value of any damaged property for which a claim has been submitted. *Id.* Because Devonshire acknowledges that it has not yet replaced the ice and water shield, American overpaid when it wrote Devonshire a check for the replacement cost value of the ice and water shield. Accordingly, unless American agreed to pay Devonshire the cost of replacing the ice and water shield regardless of whether Devonshire actually replaced it, or waived its right to an offset by not

---

[8] Because both parties agree that the *amount* of any overpayment has not yet been established, the only issue before the Court is whether American was entitled to the offset and not its amount. Docs. 96, Pl.'s Resp. Br. 16–17; 100, Def.'s Reply Br. 11.

pleading it as an affirmative defense in its answer, American was entitled to offset from its payment of the appraisal award an amount equal to its overpayment. *See Lerer Realty Corp. v. MFB Mut. Ins. Co.*, 474 F.2d 410, 413 (5th Cir. 1973) (instructing district court to reduce judgment awarding replacement costs to actual cash value where repairs had not been completed).

As evidence of American's intention to pay the replacement cost value of the ice and water shield despite it having not been replaced, Devonshire points to the fact that American's adjuster paid the full replacement cost amount even after being informed by Devonshire's counsel that the shield had not yet been installed, and having had the chance to review pictures of the shield, the repair contract, and invoices from Devonshire's roofer, as well as to inspect the roof repairs in person. Doc. 96, Pl.'s Resp. Br. 14–15. American disputes these facts and argues that it paid the replacement cost value of the shield only because Devonshire's attorney falsely told American's adjuster that the shield had been installed. Doc. 94, Def.'s Br. 13. It was only later, after the court-ordered appraisal, that American maintains it learned from Devonshire's counsel that the shield had not, in fact, been installed. Doc. 94, Def.'s Br. 14.

At the center of this dispute is an email exchange between American's adjuster, Laurie Stover, and Devonshire's attorney, Robert Loree, dating from March 27, 2012 to April 4, 2012. Doc. 95, Ex. A, Exs. 1–5. In the first email of this exchange, dated March 27, 2012, Ms. Stover notified Mr. Loree and Gary Pennington, Devonshire's adjuster, that she was authorized to pay the full replacement cost amount for the ice and water shield. *Id.* at Ex. 2. However, she explicitly stated that if Devonshire was "not ready for the full amount to be released let me know and I will release the remaining ACV amount." *Id*. In the second email, dated April 3, 2012, Mr. Loree responded to Ms. Stover that Smart Roofing, Devonshire's contractor, had "completed all the roof repairs, but not

the remaining items in the scope of work" and requested that the "full amount of $774,924.14" be released. *Id.* at Ex. 3. Devonshire contends that the ice and water shield fell within "the remaining items in the scope of work" on which Devonshire had not yet completed work. Doc. 96, Pl.'s Resp. Br. 14–15.

No reasonable juror, however, could conclude from this ambiguous email that Ms. Stover knew, when she authorized payment for the full replacement cost value of the ice and water shield, that Devonshire had not actually replaced the shield. For starters, Ms. Stover has stated in a sworn affidavit that she understood Mr. Loree's April 3, 2012 email to mean that Devonshire had completed all repairs on the roof, including replacement of the ice and water shield. Doc. 95, Ex. A, Aff. of Laurie Stover 2. As American points out, this understanding makes sense because an ice and water shield is installed on the roof, below the shingles, and thus would be considered "roof work." Doc. 100, Def.'s Reply Br. 10. Moreover, the Court takes from the fact that Ms. Stover had previously indicated in her March 27 email that she would release only the actual cost value amount if Devonshire was not ready for the full amount to be released (i.e., not all repairs had been made) that Ms. Stover believed Devonshire had replaced the shield. Otherwise, she would not have authorized payment of the full amount.[9] Whether Ms. Stover could have inspected the roof repairs

_____

[9]Although Devonshire further alleges that Ms. Stover approved the release of the full replacement cost amount after having had the opportunity to review pictures of the shield, the repair contract, and invoices from Devonshire's roofer, the Court cannot find evidence to support these allegations in the summary judgment record. Doc. 87-2, cited by Devonshire, appears to refer to photographs, reviewed by Ms. Stover, showing the damage to the roof, including the shield, *before* any repairs were made. As such, Ms. Stover's review of such photographs has no bearing on whether Ms. Stover knew that the ice and water shield had not been replaced when she approved payment of the full replacement cost value of the shield. The Court was unable to review the alleged email forwarding the contract or invoices to Ms. Stover as Devonshire has failed to cite to the relevant pages in the record as required by Local Rule 56.5 and the Court has been unable to locate these documents on its own.

to determine if the shield had been installed is irrelevant, because Ms. Stover was justified in relying on Mr. Loree's representation that the shield had been installed. As such, Devonshire's evidence is insufficient to create a genuine issue of material fact as to whether American agreed to pay the full replacement cost value of the ice and water shield regardless of whether the shield was actually replaced.

Devonshire's argument that American waived its right to an offset by not pleading it as an affirmative defense in its answer is also without merit. As discussed previously, while a defendant's failure to plead an affirmative defense in its answer may result in waiver, "technical failure to comply precisely with Rule 8(c) is not fatal" so long as the defendant raised the defense "at a pragmatically sufficient time, and the plaintiff was not prejudiced in its ability to respond." *Lucas*, 807 F.2d at 417–18 (5th Cir. 1986) (citations omitted). Here, whether or not American was required to plead its right to an offset as an affirmative defense, American timely raised its right after first becoming aware of the fact that Devonshire had not installed the ice and water shield, following the completion of the court-ordered appraisal process. Doc. 73-1, Marshall Letter. Moreover, given the plain terms of Devonshire's replacement coverage and its emails with Ms. Stover, such a defense should not have come as a surprise to Devonshire or prejudiced its ability to respond. Accordingly, the Court finds that American did not waive its right to a deduction for its overpayment of Devonshire's claim for damage to the ice and water shield.

In sum, the Court finds that the Policy required Devonshire to actually replace the ice and water shield before recovering its replacement cost and that American only paid the replacement cost value of the shield due to Devonshire's false representation that the shield had been replaced when, in fact, it had not. The Court holds, therefore, that American was entitled to offset from its

payment of the appraisal award an amount equal to its overpayment of Devonshire's claim for damage to the ice and water shield. However, as both parties acknowledge that significant questions of fact remain as to the amount of that overpayment, the Court reserves judgment as to the proper amount of the offset.

C. *Breach of the Duty of Good Faith and Fair Dealing*

American next moves for summary judgment on Devonshire's claim for breach of the duty of good faith and fair dealing and its corresponding claim for exemplary damages. American maintains that Devonshire does not have sufficient evidence to support such an action and thus, it fails as a matter of law. Doc. 94, Def.'s Br. 15. Devonshire counters by citing three pieces of evidence that it contends support an inference of bad faith and unfair dealing by American: 1) Mr. Bourque's initial "low-ball" estimate of Devonshire's loss and Belfor's alleged failure to conduct an independent investigation; 2) Ms. Stover's alleged misrepresentation that American would pay replacement cost value if Devonshire completed 50% of the repairs to the Property; and 3) American's purported denial of Devonshire's supplemental claim for damage to the carports, gutters, and downspouts. Doc. 96, Pl.'s Resp. Br. 20–22. Alternatively, Devonshire requests that the Court delay ruling on this portion of Defendant's motion under Rule 56(d) of the Federal Rules of Civil Procedure to allow Devonshire additional time to conduct necessary discovery. Doc. 96, Pl.'s Resp. Br. 19–20.[10] For the following reasons, the Court finds for American and denies Devonshire's request for a delay.

---

[10] The parties also devote a significant portion of their briefing to discussing whether Devonshire has presented sufficient evidence of independent damages to support a cause of action for breach of the duty of good faith and fair dealing. Docs. 94, Def.'s Br., 18–19; 96, Pl.'s Resp., 22–25; 100, Def.'s Reply, 14–16. However, because the Court finds that Devonshire has failed to present sufficient evidence of an underlying breach, the Court need not reach this issue.

Under Texas law, "[a]n insurer has a duty to deal fairly and in good faith with its insured in the processing and payment of claims." *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 340 (Tex. 1995); *see also Med. Care Am., Inc. v. Nat'l Union Fire Ins. Co.*, 341 F.3d 415, 425 (5th Cir. 2003). An insurer breaches its duty of good faith and fair dealing "if the insurer knew or should have known that it was reasonably clear that the claim was covered," but nevertheless denied or unreasonably delayed paying it. *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 55–56 (Tex. 1997). "Evidence establishing only a bona fide coverage dispute does not demonstrate bad faith." *State Farm Fire & Cas. Co. v. Simmons*, 963 S.W.2d 42, 44 (Tex. 1998). Accordingly, an insurer may establish its right to summary judgment by showing that there was "a good faith dispute as to coverage." *U.S. Fire Ins. Co. v. Williams*, 955 S.W.2d 267, 268 (Tex. 1997).

In this case, the undisputed evidence shows that American did not deny or unreasonably delay paying Devonshire's claim for damage to the Apartments, but rather, after engaging in back and forth negotiations with Devonshire's adjusters and counsel, made a series of payments to Devonshire before demanding that Devonshire take its remaining claim for damage to the carports, gutters, and downspouts to appraisal, as was its right under the Policy.[11] Doc. 17, Am. Compl. ¶¶ 6, 8, 11; 33, Am. Answer ¶¶ 6, 11; 95, Ex. A-5, Check from American, Ex. B, Check from American. As the resulting appraisal award was substantially less than Devonshire's claimed damages after

---

[11]American based its payment of Devonshire's initial claim for damage to the Apartments on Smart Roofing's estimate of $715,662.47 (plus an additional $10,008.06 that Devonshire had claimed in out-of-pocket expenses), which was significantly higher than the independent estimate prepared by Aaron McKinney of Belfor Properties of $610,177.19. Doc. 95, Ex. E, Stover Email. American also promptly paid the full replacement cost value of Devonshire's supplemental claim for damage to the ice and water shield. Doc. 95, Ex. A-1, Pennington Email, Ex. A-2, Stover Email, Ex. A-5, Check from American.

deducting for prior payments,[12] there is little question that American had a bona fide dispute as to the amount of loss and a good faith basis for demanding appraisal.[13]

In any case, the evidence offered by Devonshire is insufficient to support an inference to the contrary. First, with respect to Mr. Bourque's allegedly "low-ball" estimate, the Court notes that although relatively low compared to later estimates submitted by Aaron McKinney of Belfor Properties and Smart Roofing, Devonshire has presented no evidence to suggest Mr. Bourque's estimate was made in bad faith. And, as for Belfor's alleged failure to conduct an independent estimate, there is at least some evidence to suggest that Belfor did not merely copy Mr. Bourque's estimate, but as Devonshire's own adjuster has acknowledged, took the additional step of adding the damage to the Property's carports to its estimate. Doc. 96-3, Ex. B, Aff. of Gary Pennington ¶ 9. But even if Devonshire is correct that these estimates were prepared in bad faith, any inference of bad faith that may be drawn from them is nullified by the fact that American subsequently agreed to settle Devonshire's claim based on Smart Roofing's significantly higher estimate. *See supra* p. 22, fn.11; Doc. 95, Ex. E, Stover Email.

Second, concerning Ms. Stover's alleged misrepresentation to Devonshire that American would pay replacement costs once at least half of the repairs were complete, the Court observes that

---

[12] On November 29, 2012, shortly after commencement of this litigation, Devonshire increased its claimed damages from $90,938.81 to $164,637.21. Docs. 17, Am. Compl. ¶ 12; 95, Ex. H, Statement of Loss. On July 24, 2013, the appraisers agreed to an appraisal award with a replacement cost value of $220,725.19, and an actual cash value of $198,308.13, less prior payments. Doc. 73-1, Ex. A, Marshall Letter and Appraisal Award. Devonshire subsequently acknowledged that the maximum amount American owed after deducting for amounts already paid was $114,638.30. Doc. 62, Notice of Supplemental Appraisal Award.

[13] American timely paid what it reasonably believed to be the full amount of the appraisal award on July 31, 2013. *See infra* pp. 29–32; Docs. 73-1, Ex. C, Loree Letter and Check from American; 95, Ex. J, Anderson Letter.

Ms. Stover made this offer to settle Devonshire's entire claim, but that Devonshire declined to accept. *See supra* p. 11;  Doc. 96, Ex. B-2, Stover Email. Having done so, Devonshire cannot now seek to use American's refusal to honor the offer as evidence of American's bad faith.

Devonshire's third piece of evidence—American's purported denial of Devonshire's supplemental claim for damage to the carports, gutters, and downspouts—is contradicted by the uncontroverted record in this case, which as discussed above, shows that American did not deny Devonshire's supplemental claim for damage to the carports, gutters, and downsports, but rather demanded that the claim go to appraisal. *See supra* pp. 22–23. As American timely issued payment of what it reasonably understood to be the full amount of the resulting appraisal award to Devonshire, no grounds exist for finding that American denied Devonshire's supplemental claim for damage to the carports, gutters, and downspouts. *Id.*

In sum, the Court concludes that Devonshire has failed to produce any evidence from which a reasonable juror could infer that American delayed or denied payment after it knew or should have known that it was reasonably clear that Devonshire's claim was covered. It, therefore, grants American's request for summary judgment as to Devonshire's cause of action for breach of the duty of good faith and fair dealing. Morever, because Devonshire's claim for exemplary damages is predicated on American's having breached its duty of good faith and fair dealing, and because Devonshire has submitted no evidence to suggest that American was aware that its handling of Devonshire's claim posed a risk of extraordinary harm to Devonshire, the Court also finds that American is entitled to summary judgment on Devonshire's claim for exemplary damages. *See Giles*, 950 S.W.2d at 57 (holding that "punitive damages can be awarded for bad faith only when an insurer was actually aware that its actions involved an extreme risk—that is, a high probability of serious

harm, such as death, grievous physical injury, or financial ruin—to its insured and was nevertheless consciously indifferent to its insured's rights, safety, or welfare").

Having so held, the Court briefly considers and rejects Devonshire's request for a delay and additional time to conduct discovery under Rule 56(d) of the Federal Rules of Civil Procedure. Rule 56(d) provides: "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). In support of its request for a deferral, Devonshire has appended an affidavit from Robert Loree, Devonshire's counsel. Doc. 96-1, Loree Aff. In his affidavit, Mr. Loree claims that American's refusal to cooperate in setting a date for the depositions of Laurie Stover and Kenneth Bourque prevented Devonshire from deposing them before the close of discovery. *Id.* at ¶ 3. These depositions, Mr. Loree maintains, were necessary to develop essential facts related to the handling of Devonshire's insurance claims by Ms. Stover and Mr. Bourque. *Id.* at ¶ 4. American responds by claiming that Devonshire never noticed any depositions during the discovery period and that Devonshire's motion to compel discovery, which the Court partially granted on August 30, 2013, did not request an order compelling any depositions. Doc. 100, Def.'s Reply Br. 11.

After reviewing the parties' briefing and Mr. Loree's affidavit, the Court concludes that Devonshire has failed to make the showing necessary for a deferral under Rule 56(d). That is, it has failed to provide specific reasons why it cannot present facts essential to its opposition. Rather, Mr. Loree has merely made a general allegation, uncorroborated by any supporting documentation, that American's counsel was uncooperative in scheduling the depositions of Kenneth Bourque and Laurie

Stover. Accordingly, Devonshire's request for a deferral and additional time for discovery under Rule 56(d) is DENIED.

*D. Violations of Chapter 541 of Texas Insurance Code and the Deceptive Trade Practices Act*

American last moves for summary judgment as to Devonshire's claims that American violated Chapter 541 of the Texas Insurance Code and the Deceptive Trade Practices Act ("DTPA"). For the reasons that follow, the Court grants American's request for summary judgment as to both claims.

In Texas, an individual who has been damaged by "unfair methods of competition or unfair or deceptive acts or practices in the business of insurance" may bring a cause of action under the Texas Insurance Code against the "person or persons engaging in such acts or practices." Tex. Ins. Code § 541.151 (formerly codified at Tex. Ins. Code, art. 21.21); *see Transitional Hosp. Corp. v. Blue Cross & Blue Shield of Tex., Inc.*, 164 F.3d 952, 955 (5th Cir. 1999); *Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 460 (5th Cir. 1997); *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 382–83 (Tex. 2000)."The prohibited conduct includes 'failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear.'" *Performance Autoplex II Ltd.*, 322 F.3d at 860-61 (quoting Tex. Ins. Code § 541.151). A violation of Chapter 541 of the Insurance Code is also a violation of the DTPA. Tex. Bus. & Comm. Code § 17.50(a); *Vail v. Texas Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129, 135 (Tex. 1988); *Thrash v. State Farm Fire & Cas. Co.*, 992 F.2d 1354, 1357–58 & n.19 (5th Cir. 1993); *Kondos*, No. 1:03-CV-1440, 2005 WL 1004720, at *12 (E.D. Tex. Apr. 25, 2005).

Critically, the Texas Supreme Court has modified the common law standard of bad faith to mirror the standard for determining when an insurer's actions constitute an unfair insurance practice

under Chapter 541 of the Insurance Code and the DTPA. *Giles*, 950 S.W.2d at 55 (adopting Insurance Code's "reasonably clear" standard in place of the common law's "no reasonable basis" standard for all bad faith claims). As a result, "when an insured joins claims under the Texas Insurance Code and the DTPA with a bad faith claim asserting a wrongful denial or delay in the payment of policy benefits, if there is no merit to the bad faith claim, there can be no liability on the statutory claims." *Kondos,* 2005 WL 1004720, at *13 (citing *Higginbotham*, 103 F.3d at 460).

Here, Devonshire's grounds for arguing that American violated the Insurance Code and DTPA are identical to its grounds for arguing that American violated its common law duty of good faith and fair dealing. Doc. 96, Pl.'s Resp. Br. 19–22. As such, they fail as a matter of law for the same reason that Devonshire's bad faith claim fails: Devonshire has failed to come forward with sufficient evidence to show that American acted unreasonably in its handling of Devonshire's claims. *See supra* pp. 22–24. American's request for summary judgment as to Devonshire's Chapter 541 and DTPA claims is therefore granted.

### E. Breach of Contract

Devonshire moves for summary judgment on its claim that American breached its contract with Devonshire when it denied Devonshire's supplemental claim for damage to the metal carport roofs, downspouts, and gutters. As evidence of this breach, Devonshire points to the appraisal award that both parties' appraisers agreed to on July 24, 2013, which according to Devonshire, "undisputably" shows that American still owed additional benefits when it denied Devonshire's supplemental claim. Doc. 93, Pl.'s Br. 4–5. American responds by arguing that under Texas law, Devonshire is estopped from maintaining a breach of contract action against it, because the parties submitted to the contractual appraisal process and American timely issued payment of the resulting

award. Doc. 97, Def.'s Resp. Br. 3–4. As explained below, the Court finds that, at the very least, material issues of fact remain as to whether Devonshire is estopped from asserting its claim.

The elements of a breach of contract claim in Texas are: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from the breach." *Frazin v. Hanley*, 130 S.W.3d 373, 376 (Tex. App.—Dallas 2004, no pet.). Under Texas insurance law, however, "where the parties disagree on the amount of loss and submit to the contractual appraisal process to resolve that dispute, and the insurer pays all covered damages determined by the award, the insured may not then argue that the initial failure to pay those damages equates to a breach of the contract." *Scalise v. Allstate Texas Lloyds*, No. 7:13-CV-178, 2013 WL 6835248, at *5 (S.D. Tex. Dec. 20, 2013); *see also Blum's Furniture Co. v. Certain Underwriters at Lloyds London*, No. Civ. A. H-09-3479, 2011 WL 819491, at *3 (S.D. Tex. Mar. 2, 2011), *aff'd* 459 F. App'x 366 (5th Cir. 2012) (holding that "when an insurer makes timely payment of a binding and enforceable appraisal award, and the insured accepts that payment, the insured is estopped by the appraisal award from maintaining a breach of contract claim against [the insurer]") (internal quotations and citations omitted); *Church on the Rock North v. Church Mut. Ins., Co.*, No. 3:10-CV-0975-L, 2013 WL 497879, at *6 (N.D. Tex. Feb. 11, 2013) (finding that estoppel applies where there is a binding and enforceable appraisal award, the insurer timely pays the award, and the insured accepts the payment); *Breshears v. State Farm Lloyds*, 155 S.W.3d 340, 343 (Tex. App.—Corpus Christi 2004, pet. denied) (holding that insured "may not use the fact that the appraisal award was different than the amount originally paid as evidence of breach of contract"). The reason for this defense is to prevent the insured from taking advantage of the binding appraisal process to determine the value of its claim and then, after the insurer fully pays

the appraisal award, suing the insurer for its initial failure to pay. *Breshears*, 155 S.W.3d at 343 (observing that "an appraisal decision is intended 'to estop one party from contesting the issue of the value of damages in a suit on the insurance contract,'" not to facilitate this type of [contractual] liability") (quoting *Allison v. Fire Ins. Exch.*, 98 S.W.3d 227, 253 (Tex. App.—Austin 2002, pet. abated). The defense applies with special force "when the contract [the insured] claim[s] is being breached provides for resolution of disputes through appraisal." *Id.*

    In this case, the policy between American and Devonshire provides for binding appraisal. Doc. 96-2, Ex. A-1, Policy Form ¶ E(2). A separate provision of the Policy requires American to "pay for covered loss or damage within 5 business days after . . . an appraisal award has been made." Doc. *Id.* at ¶ G(2)(b). Shortly after this litigation commenced, American invoked its right under the appraisal provision of the Policy to demand an appraisal of Devonshire's supplemental claim for damage to the carports, gutters, and downspouts. Doc. 18, Mot. to Compel Appraisal. After Devonshire refused to submit to the appraisal process, American filed a motion to compel, which this Court granted on March 26, 2013. Doc. 35. On July 24, 2013, the appraisers returned an appraisal award with a replacement cost value of $220,725.19, and an actual cash value of $198,308.13, less prior payments. Doc. 73-1, Ex. A, Marshall Letter and Appraisal Award. On July 31, 2013, American issued a check to Devonshire for $66,905.32, the amount it contends it owed under the appraisal award after deducting prior payments for the carports and gutters and its overpayment of Devonshire's claim for damage to the ice and water shield. Doc. 73-1, Ex. C, Loree Letter.

    From a cursory review of the record, then, it would appear that American has a strong case for arguing that Devonshire is estopped from claiming that American's initial failure to pay the claim

amounted to a breach of contract. Devonshire argues, however, that American cannot raise an estoppel defense because it did not formally demand appraisal before litigation commenced, did not fully or timely pay the appraisal award, and because Devonshire did not accept payment of the award.[14] Doc. 99, Pl.'s Reply Br. 5–6. The court addresses and ultimately dismisses each of these arguments, in turn.

Devonshire's first argument, that American cannot raise an estoppel defense because it did not formally demand an appraisal before Devonshire filed suit, is wholly without merit or legal support. As stated above, the reason an insured is estopped from maintaining a breach of contract claim against the insurer after receiving full payment of an appraisal award is that the very object of the binding appraisal process is to avoid litigation on the issue of damages and not to facilitate liability. *See Breshears*, 155 S.W.3d at 343. As the court observed in *Breshears*, this reasoning applies with special force where, as here, the parties agreed to provide for a binding appraisal process in their contract. *Id.* Given this logic, it is irrelevant to an insurer's ability to raise an estoppel defense whether the insurer demands appraisal before or after litigation has commenced, so long as the appraisal results in a binding and enforceable award that is timely and fully paid by the insurer. This is so even if, as a matter of practice, the insured generally demands appraisal before the commencement of a lawsuit.  *See e.g., Scalise*, 2013 WL 6835248, at *1.

The Court, moreover, already held that American's demand for appraisal in this case was timely. Doc. 35, Order 5–7. In so holding, the Court found Devonshire's argument to the contrary

---

[14] Devonshire also argues that American waived this estoppel defense by failing to plead it as an affirmative defense in its answer. Doc. 99, Pl.'s Reply Br. 4, fn.2. However, American could not have pleaded this defense in its answer because the appraisal did not occur in this case until well after litigation had begun. The Court finds, therefore, that American timely raised this defense.

to be "disingenuous," as Devonshire essentially pre-empted American's ability to formally demand appraisal prior to litigation by filing suit without responding to American's earlier request for appraisal. *Id.* "To hold that Defendant waived its right to appraisal because it asked whether Plaintiff would submit to appraisal and waited for response, rather than formally demand appraisal," the Court stated, "would be patently unfair." *Id.*

Devonshire's second argument, that American cannot raise an estoppel defense because it did not fully pay the appraisal award, is similarly unavailing. Again, the record shows that on July 24, 2013, the appraisers for American and Devonshire both signed an appraisal award stating that the replacement cost of the carports, gutters, and downspouts was $220,725.19, with an actual cash value of $198,308.13, less any prior payments. Doc. 73-1, Ex. A, Marshall Letter and Appraisal Award. On July 31, 2013, after deducting prior payments for the carports, gutters, and downspouts, applying an offset for its overpayment of Devonshire's claim for damage to the ice and water shield, and adding an unpaid cost not addressed by the appraisal, American calculated the amount due to Devonshire following the appraisal as $66,905.32 and issued a check to Devonshire for that amount. Doc. 73-1, Ex. C, Loree Letter and Check from American. Devonshire alleges that this sum did not amount to full payment of the appraisal award because Devonshire was entitled to receive the full replacement cost value of the appraised damage to the carports, gutters, and downspouts, without an offset for American's overpayment of Devonshire's claim for damage to the ice and water shield. Doc. 99, Pl.'s Reply Br. 6. As previously discussed, however, the plain terms of the Policy only required American to pay the actual cash value of the appraisal award, because Devonshire had not completed repairs of the carports, gutters, and downspouts in order to recover replacement costs. For the same reason, American was entitled to deduct from its payment an amount equal to its

overpayment of Devonshire's claim for damage to the ice and water shield. Although this amount, as well as the amount of prior payments for the carports and gutters are still in dispute, the Court is convinced that American has at the very least raised a genuine issue of material fact as to whether it made full payment of the appraisal award.

The Court also rejects Devonshire's third argument that American cannot raise an estoppel defense because it did not timely pay the appraisal award. The terms of the parties' policy required American to "pay for covered loss or damage within 5 business days after an appraisal award has been made." Doc. 96-2, Policy Form ¶ G(2)(b). An appraisal award was issued for Devonshire's supplemental claim for damage to the carports, gutters, and downspouts on July 24, 2013. Doc. 73-1, Ex. A, Marshall Letter and Appraisal Award. According to Devonshire, however, American did not issue payment until August 6, 2013, nine (9) business days after the award was issued. Doc. 99, Pl.'s Reply Br. 6.

Devonshire's account of the facts, however, is not supported by the summary judgment record. The record shows that American issued a check to Devonshire on July 31, 2013 for $66,905.32, the full amount of the appraisal award according to American's calculations. Doc. 73, Def.'s Mot. to Compel Completion of Appraisal 3; Doc. 73-1, Ex. C, Loree Letter, 39–41. Because the check was issued on the fifth business day after the appraisal award, American's payment was timely.

Finally, the Court refuses to accept Devonshire's argument that American cannot raise an estoppel defense because Devonshire never accepted payment of the appraisal award issued by American. Contrary to Devonshire's assertion, the case law is unclear as to whether the insured's acceptance of the insurer's payment of an appraisal award is required before an insurer can seek to

estop the insured from claiming breach of contract. At least one court has held that all that is required for estoppel to apply is a binding and enforceable appraisal award and the insurer's full payment of the award. *See Scalise*, 2013 WL 6835248, at \*4–5. Another court has indicated that the insurer need only comply with every requirement of the contract's appraisal provision—in that case, full payment of the appraisal award—for estoppel to apply. *Breshears*, 155 S.W.3d at 344. Other courts, however, have indicated that the insured's acceptance of payment is also required. *Church on the North Rock*, 2013 WL 497879, at \*9; *Blum's Furniture Co.*, 2011 WL 819491, at \*3. ("A plaintiff . . . is estopped from pursuing a breach of contract claim not by the issuance of the appraisal award. Instead, the plaintiff is estopped only where, as here, the plaintiff ***accepts payment*** of the appraisal amount from the insurer.") (emphasis in the original). These decisions, however, appear to be based on an over-reading of an earlier Texas case, *Franco v. Slovanic Mut. Fire Ins. Ass'n*, 154 S.W.3d 777, 787 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

In *Franco*, the parties disagreed on the amount of property loss and submitted to a contractual appraisal process. *Id.* The insurer subsequently issued payment for the full amount of the resulting award, which the insured accepted. *Id.* "Under these circumstances," the court held, "[the insured is] estopped by the appraisal award from maintaining a breach of contract claim against [the insurer]." *Id.* But the court did not expressly state, as *Church on the North Rock* and *Blum's Furniture* appear to suggest, that the insured's acceptance of payment was a necessary condition for estoppel to apply. *See id.* Rather, the court merely implied that it was a sufficient condition. *See id.* The Court therefore concludes that so long as there is a binding and enforceable appraisal award and the insurer timely and full pays the resulting award, estoppel should apply regardless of whether the insured actually accepts payment.

- 33 -

Having so concluded, the Court turns to the facts currently before it. In this case, the Policy's appraisal provision required American to issue payment to Devonshire within five business days of the appraisal award. Doc. 96-2, Ex. A-1, Policy Form ¶ G(2)(b). Since as discussed above, American timely issued payment to Devonshire and has at the very least raised a genuine issue of material fact as to whether this payment was for the full amount of the appraisal award, American has strong grounds for arguing that Devonshire is estopped from claiming that American's initial failure to pay its supplemental claim for damage to the carports, gutters, and downspouts amounted to a breach of contract. As such, Devonshire's request for summary judgment on its breach of contract claim is denied.

E. *Violations of Chapter 542 of the Texas Insurance Code*

Devonshire next moves for summary judgment on its claim for statutory interest and attorney's fees under Chapter 542 of the Texas Insurance Code, also known as the Texas Prompt Payment of Claims Act ("TPPCA"). Tex. Ins. Code § 542.051 *et seq.*[15] To establish such a claim, Devonshire must show that (1) it made a claim under an insurance policy, (2) American is liable for the claim, and (3) American failed to follow one or more sections of the statute with respect to the claim. *See Allstate Ins. Co. v. Bonner*, 51 S.W.3d 289, 291 (Tex. 2001). The first two elements are undisputed in this case. Devonshire made a claim on May 25, 2011 and American has never contested that it is liable for this claim.  *See* Docs. 17, Am. Compl. ¶ 5; 33, Am. Answer ¶ 5; 93-7,

---

[15] Formerly codified at Tex. Ins. Code art. 21.55 § 1 *et seq.*, the statute provides, in relevant part, that "[i]f an insurer that is liable for a claim under an insurance policy is not in compliance with this subchapter, the insurer is liable to pay the holder of the policy or the beneficiary making the claim under the policy, in addition to the amount of the claim, interest on the amount of the claim at the rate of 18 percent a year as damages, together with reasonable attorney's fees." Tex. Ins. Code § 542.060.

Ex. B-1, First Notice of Loss Snapshot Report. Thus, the sole issue on summary judgment is whether American failed to follow one or more sections of the TPPCA with respect to Devonshire's claim.

Devonshire alleges that American committed two separate violations of the TPPCA for which Devonshire is entitled to statutory interest. First, it alleges that American violated Section 542.056(a) of the TPPCA when it failed to accept or deny Devonshire's claim in writing within 15 business days of "receiv[ing] all items, statements, and forms" it required "to secure final proof of loss."[16] Doc. 93, Pl.'s Br. 10. Second, it alleges that American violated Section 542.058 of the TPPCA when it failed to pay Devonshire's claim within 60 days after "receiving all items, statements, and forms reasonably requested and required under Section 542.055."[17] Id. at 11.

American's response to these claims is twofold. First, American argues that Devonshire cannot recover statutory interest under Section 542.060 for American's alleged violation of Section 542.056, because Section 542.056 does not contain language specifically requiring an insurer who fails to timely accept or deny a claim to pay statutory interest under Section 542.060, as does Section 542.058(a). Doc. 97, Def.'s Resp. Br. 5. Second, American maintains that it did not violate Section 542.058 because it paid Devonshire's claim well before Devonshire had submitted "any documentation or proof of loss on its claim," and thus, statutory interest never began to run. Id.

---

[16] American claims statutory interest began to accrue under Section 542.060 for this violation 36 days after American received written notice of Devonshire's claim (i.e., 15 business days after the passage of the initial 15 day period that American had under Section 542.055 to request from Devonshire "all items, statements, and forms" that American reasonably believed would be required to process Devonshire's claim). Doc. 93, Pl.'s Br. 10.

[17] American claims statutory interest began to accrue under Section 542.060 for this violation 75 days after American received written notice of Devonshire's claim (i.e., 60 days after the passage of the initial 15 day period that American had under Section 542.055 to request from Devonshire "all items, statements, and forms" that American reasonably believed would be required to pay Devonshire's claim). Doc. 93, Pl.'s Br. 11.

The parties thus forward drastically different views of when a violation occurs under the TPPCA for which the insured is entitled to statutory interest, which the Court must resolve before it can rule on the merits of Devonshire's claims. In order to do so, the Court must answer two distinct, yet related, questions: *first*, whether an insurer's violation of Section 542.056(a) of the TPPCA triggers the accrual of statutory interest under Section 542.060 (or whether only a violation of Section 542.058 entitles the insured to such damages); and *second*, when statutory interest begins to accrue under Section 542.060 for a violation of Section 542.056(a)—assuming a violation of this provision does in fact trigger the accrual of statutory interest—or Section 542.058, if it does not. Both are questions of law that are proper for the Court to decide at this time.

Unfortunately, the case law on both subjects is mixed and neither the Texas Supreme Court nor the Fifth Circuit has addressed either issue. Absent such guidance, the Court must make an educated "*Erie* guess" as to how the Texas Supreme Court would resolve these two issues. *Audler v. CBC Innovis Inc.*, 519 F.3d 239, 248–249 (5th Cir. 2008) (referring to *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)). In doing so, the Court "may consult a variety of sources, including the general rule on the issue, decisions from other jurisdictions, and general policy concerns." *Id.* at 249; *see also Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 565 (5th Cir. 2004) ("In making an 'Erie guess' in a diversity case, this court will seek guidance by looking to the precedents established by intermediate state appellate courts only when the state supreme court has not spoken on an issue. However, if convinced by other persuasive data that the highest court of the state would decide otherwise, this court will not defer to the decisions of the intermediate state appellate courts.") (internal quotations and citations omitted).

Applying these principles, the Court ultimately concludes that the statute is best read as

providing for statutory penalty interest for violations of Section 542.056 and that such interest accrues 15 business days after the insurer receives all items, statements, and forms it requires "to secure proof of loss," which in cases where the insurer fails to timely request such information under Section 542.055, is 15 business days after the date the insurer receives notice of the insured's claim.

The Court turns first, then, to the question of whether an insurer's failure to timely accept or deny a claim in writing in violation of Section 542.056 causes statutory interest to accrue under Section 542.060. Relevant to the Court's analysis, Sections 542.055, 542.056, and 542.058 of the TPPCA establish a series of procedural deadlines and requirements designed to facilitate the timely processing and payment of claims by insurers. First, Section 542.055(a) of the TPPCA requires that not later than the 15th day after the date the insurer receives notice of a claim, "the insurer shall: (1) acknowledge receipt of the claim; (2) commence any investigation of the claim; and (3) request from the claimant all items, statements, and forms that the insurer reasonably believes, at that time, will be required from the claimant." Tex. Ins. Code § 542.055(a). Section 542.056(a) then provides that "an insurer shall notify a claimant in writing of the acceptance or rejection of a claim not later than the 15th business day after the date the insurer receives all items, statements, and forms required by the insurer to secure final proof of loss." *Id.* § 542.056(a). Finally, Section 542.058 requires the insurer to pay the claim within 60 days of "receiving all items, statements, and forms reasonably requested and required under Section 542.055" or else "pay damages . . . as provided by Section 542.060." *Id.* § 542.058(a). It is under 542.060(a) that "the insurer is liable to pay the holder of the policy or the beneficiary making the claim under the policy, in addition to the amount of the claim, interest on the amount of the claim at the rate of 18 percent a year as damages" if "[the] insurer is liable for a claim under an insurance policy and is not in compliance with this subchapter."

*Id.* § 542.060(a).

While at first glance this scheme for promoting prompt handling and payment of claims seems straightforward enough, closer examination of the statute's provisions reveals a disturbing inconsistency: Section 542.060(a) appears to provide for statutory interest for *any* violation of the TPPCA, *see id.* ("If an insurer . . . is not in compliance with *this subchapter*, the insurer is liable to pay . . .") (emphasis added), but only Section 542.058 includes express language tying a violation of its prompt payment requirement to statutory interest under Section 542.060(a). Left unclear is whether an insurer's failure to comply with the TPPCA's other provisions, such as Section 542.056's prompt notification of acceptance or rejection requirement, triggers the accrual of statutory interest under Section 542.060(a).

Moreover, as noted above, the case law does nothing to clear up this ambiguity. At least one court has expressly held that "any violation of Chapter 542 by [the insurer] triggers the statutory interest penalty." *U.S. Fire Ins. Co. v. Lynd Co.*, 399 S.W.3d 206, 222 (Tex. App.—San Antonio 2012, pet. denied). But that court appears to have relied solely on the text of Section 542.060 in reaching its holding and made no attempt to reconcile the seemingly inconsistent language of Sections 542.056 and 542.058. *See id.* Other courts have simply recognized an insured's claim for statutory interest for the insurer's violation of Section 542.056 without addressing whether the statute's text supports such a claim. *C.K. Lee v. Catlin Specialty Ins. Co.*, 766 F.Supp.2d 812, 826 (S.D. Tex. 2011); *Nunn v. State Farm Mut. Auto. Ins. Co.*, 729 F.Supp.2d 801 (N.D. Tex. 2010). On the other hand, at least one court has held that an insurer's violation of Section 542.056(a)'s prompt notification requirement does not support a claim for statutory penalty interest, because unlike Section 542.058, the provision does not specifically tie an insurer's failure to comply to the

imposition of damages under Section 542.060. *GuideOne Lloyds Ins. Co. v. First Baptist Church of Bedford*, 268 S.W.3d 822, 834 (Tex. App.—Fort Worth 2008, no pet.). That court, however, did not grapple with the language of Section 542.060(a) providing that any "insurer . . . that is not in compliance with *this subchapter*" shall pay damages. *See id.* (emphasis added).

Faced with this uncertainty, the Court finds that the statute is best read as providing for the imposition of statutory interest under Section 542.060(a) for violations of Section 542.056's prompt notification requirement for the simple reason that this construction does the least damage to the statute as a whole. Were the Court to take the opposite position and find that an insurer's violation of Section 542.056(a) does not trigger the accrual of statutory interest under Section 542.060, Section 542.056's prompt notification requirement would effectively be rendered toothless in contravention of well-established rules of statutory construction. *See e.g.*, *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 493 (Tex. 2001) (courts must consider the statute as a whole and not give one provision a "meaning out of harmony or inconsistent with other provisions"); *Miss. Poultry Ass'n, Inc. v. Madigan*, 31 F.3d 293, 304 (5th Cir. 1994) (statutes should be interpreted so as not to render one part inoperative). In other words, without the threat of statutory interest under Section 542.060, the insurer has little incentive to provide the insured with prompt written notice of the insurer's acceptance or rejection of the claim, thereby rendering Section 542.056's prompt notification requirement superfluous. Thus, while the Court's reading fails to offer an explanation for why Section 542.058 contains specific language tying an insurer's violation of its prompt payment requirement to the accrual of statutory damages under Section 542.060 and Section 542.056 does not, it comes closer to harmonizing and giving effect to each of the TPPCA's provisions. *See Helena Chem. Co.*, 47 S.W.3d at 493.

- 39 -

The Court's reading also has the virtue of being consistent both with the Texas legislature's command that the TPPCA "shall be liberally construed to promote the prompt payment of insurance claims," Tex. Ins. Code § 542.054, as well as a long line of Texas Supreme Court cases interpreting the TPPCA and its predecessor statutes as penal in nature. *See State Farm Life Ins. Co. v. Martinez,* 216 S.W.3d 799, 801–805 (Tex. 2007) (observing that "[s]ince at least 1874, there have been Texas statutes punishing an insurer's failure to promptly pay" that "were considered penal in nature"); *id.* at 805, fn.24 (collecting cases); *Republic Underwriters Ins. Co. v. Mex-Tex, Inc.,* 150 S.W.3d 423, 424–428 (Tex. 2004) (referring to the TPPCA's 18% interest rate as "penalty interest"). It is this notion—that the TPPCA is designed to punish insurers for failing to timely process and pay claims—that gives credence to the Court's position that the Texas Legislature most likely intended for statutory interest to accrue under Section 542.060 for an insurer's violation of *any* of the statute's multiple requirements (i.e., prompt acknowledgment, prompt notification of acceptance or rejection, prompt payment). Had the Legislature wished only to compensate claimants for the late payment of their claims, it could have left out these additional requirements and merely required the insurer to timely pay claims or pay interest on the claim at the prime rate published by the Board of Governors of the Federal Reserve System, as is done for post-judgment interest. *See* Tex. Fin. Code ¶ 304.003(c).

Having determined that an insurer's failure to provide timely written notice of its acceptance or denial of a claim in violation of Section 542.056 causes statutory interest to accrue under Section 542.060, the Court must now determine precisely when statutory interest begins to accrue under the TPPCA for such a violation. To review, Section 542.056(a) requires an insurer to "notify a claimant in writing of the acceptance or rejection of a claim not later than the 15th business day after the date

the insurer receives all items, statements, and forms required by the insurer to secure final proof of loss." Tex. Ins. Code § 542.056(a). The key, then, to resolving when a violation of Section 542.056 has occurred, and thus when statutory interest begins to accrue under Section 542.060, is determining the date on which "the insurer receives all items, statements, and forms required by the insurer to secure final proof of loss." While this would normally seem a question of fact for the jury to decide, the issue is complicated where, as here, the insurer never requested any information from the insured within the 15-day period provided for by Section 542.055.

Several courts, however, have specifically addressed this issue under Section 542.058 and found that when the insurer fails to timely request additional information within the statutory deadline imposed by Section 542.055, the insurer has "all items, statements, and forms" that it reasonably believes it will need as of the date the insurer received notice of the insured's claim. *See United Nat'l Ins. Co. v. AMJ Invs., LLC*, No. 14-12-00941-CV, 2014 WL 2895003, at *12–*13 (Tex. App.—Houston [14th Dist.] Jun. 26, 2014, no pet. h.); *Cox Operating, L.L.C. v. St. Paul Surplus Lines Ins.Co.*, No. 07-CV-2724-H, 2014 WL 109397, at *3 (S.D. Tex. Jan. 10, 2014); *see also Phil. Indem. Ins. Co. v. C.R.E.S. Mgmt., L.L.C.*, No. 4:09-CV-01032, 2011 WL 1100218, at *3 (S.D. Tex. 2011) (finding that statutory interest began accruing 75 days[18] from notice of the claim, where insurer neglected to request additional information within the time provided by Section 542.055). As the court in *Cox* explained, the reasoning behind this reading of the statute is that "[p]ractically

---

[18] Under Section 542.059, "[i]n the event of a weather-related catastrophe or major natural disaster, as defined by the commissioner, the claim-handling deadlines imposed under this subchapter are extended for an additional 15 days." Tex. Ins. Code § 542.059(b). If the facts in *Philadelphia Indemnity* had not involved a weather-related catastrophe, the statutory penalty interest would have accrued 60 days from notice of the claim.

speaking, when an insurer fails to timely request information under Section 542.055, it waives the

right to do so . . . and signals to the insured that it has all the information that it reasonably believes

will be required from the insured [to pay its claim]." *Cox Operating*, 2014 WL 109397, at *3. "It is

only 60 days after receiving all the information reasonably requested," the court continued, "that the

insurer must pay the claim, and if it fails to do so, [pay damages] as provided by Section 542.060."

*Id.*

Although these cases were addressing claims for statutory interest for violations of Section

542.058's timely payment requirement, their reasoning applies with equal force to a claim for

statutory damages for a violation of Section 542.056's timely notification requirement, which

similarly requires the insurer to take action only after it "receives all items, statements, and forms

required by the insurer to secure final proof of loss." Tex. Ins. Code ¶ 542.056(a). Accordingly, the

Court finds that where an insurer fails to timely request additional information from the insured

within the statutory deadline imposed by Section 542.055, the insurer indicates that it has "all items,

statements, and forms" it requires "to secure final proof of loss" as of the date it receives notice of

the insured's claim.[19] Within 15 business days of that date, the insurer must notify the insured in

writing whether it accepts or rejects the claim. Statutory interest begins to accrue under Section

540.060 the following day.

---

[19] While it is true that under Section 542.055(b), "an insurer may make additional requests for
information if during the investigation of the claim the additional requests are necessary," courts have held
that the insurer must make a timely initial request for such information under Section 542.055(a) in order to
take advantage of Section 542.055(b)'s process for requesting additional documentation. *See e.g., Cox
Operating*, 2014 WL 109397, at *3; *Phil. Indem.*, 2011 WL 1100218, at *3; *see also Nunn*, 729 F.Supp.2d at
811 (holding that insurer could make additional request for information under Section 542.055(b) where
insurer had previously made initial request for information within the statutory deadline imposed by Section
542.055(a)).

Having determined first, that an insurer's failure to comply with Section 542.056's prompt notification requirement triggers the accrual of statutory penalty interest under Section 542.060 and second, that statutory interest begins to accrue 15 business days after the insurer receives notice of the insured's claim (in cases where the insurer fails to timely request additional information under Section 542.055), the Court now turns to Devonshire's claim for statutory interest for American's alleged violations of Sections 542.056 and 542.058 of the TPPCA. It is undisputed that American received written notice of Devonshire's claim on May 25, 2011. Docs. 17, Am. Compl. ¶ 5; 33, Am. Answer ¶ 5; 93-7, Ex. B-1, First Notice of Loss Snapshot Report. American, moreover, does not dispute that it did not request any items, statements, or forms from Devonshire within the 15 days following its receipt of Devonshire's claim, as provided for by Section 542.055, and the Court has found no evidence of such a request in the record. As such, the Court finds that American had "all items, statements, and forms" it required "to secure proof of loss" on May 25, 2011, the date it received notice of the claim. American was required under Section 542.056, therefore, to notify Devonshire in writing of its acceptance or rejection of the claim within 15 business days or by June 15, 2011. American does not dispute that it failed to do so and the Court has found no evidence in the record to suggest that it did. Accordingly, the Court holds that interest at the rate of 18% a year began to accrue on Devonshire's claim beginning June 16, 2011 and continued to accrue until August 15, 2011, the date on which American unquestionably accepted Devonshire's claim by partially paying it. Docs. 17, Am. Compl. ¶ 6; 33, Am. Answer ¶ 6; 95, Ex. B, Check from American; *cf. AMJ Invs.*, 2014 WL 2895003, at *12 (finding evidence that insurer paid claim was evidence that it received it).

The Court further finds that from July 24, 2011 to April 10, 2012, statutory interest accrued

on the unpaid portions of Devonshire's claim due to American's failure to comply with Section 542.058's prompt payment requirement. Section 542.058(a) requires an insurer to pay an insured's claim within 60 days of "receiving all items, statements, and forms reasonably requested and required under Section 542.055." Tex. Ins. Code § 542.058(a). As previously discussed, by failing to request from Devonshire "all items, statements, or forms" that it "reasonably believed" it needed to pay Devonshire's claim within the statutory deadline imposed by Section 542.055(a), American indicated that it had "all items, statements, and forms" it required as of the date it received notice of Devonshire's claim, or May 25, 2011. Under Section 542.058(a), American was therefore required to pay Devonshire's claim within 60 days of this date, or by July 24, 2011. Although American made payments to Devonshire on August 15, 2011 and again on October 14, 2011, *see* docs. 17, Am. Compl. ¶ 8; 33, Am. Answer ¶ 6; 95, Ex. B, Check from American, American did not fully pay the claim until April 10, 2012. Doc. 95, Ex. A-5, Check from American. From July 24, 2011 to April 10, 2012, therefore, statutory interest accrued under Section 542.060 on the unpaid portions of Devonshire's claim. *Republic Underwriters*, 150 S.W.3d at 427–28 (an insured is entitled to penalty interest on the difference between the amount of the claim as determined to be owed and the amount the insurer unconditionally tendered); *GuideOne*, 268 S.W.3d at 831 ("[T]he amount of the 'claim' on which a penalty is calculated is the amount ultimately determined to be owed to the claimant, less any partial payments made.").

American's attempt to avoid having to pay statutory interest for this entire period is unavailing. American argues that "where an insured increases its claim based on supplemental documentation, the deadlines for Chapter 542 interest begin to run from the date the documentation is submitted to the insurer and not timely paid." Doc. 97, Def.'s Resp. Br. 6 (citing

*Lamar Homes Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 19 (Tex. 2007). American's reliance on *Lamar Homes*, however, is misplaced. In *Lamar Homes*, the Texas Supreme Court was asked, by way of a certified question from the Fifth Circuit, to decide whether the TPPCA applies to an insurer's breach of the duty to defend.[20] *Id.* at 16. After deciding that it did, the Supreme Court went on to discuss the issue of when precisely statutory interest begins to accrue under Section 542.060 for such a breach. *Id.* at 19. Quoting the language of Sections 542.056(a) and Section 542.058, the Court stated that "[t]he statutory deadlines for accepting and paying the claim do not begin to run until the insurer has 'receive[d] all items, statements, and forms required by the insurer to require proof of loss.'" *Id.* Continuing, the Court observed that "when the insurer wrongfully rejects its defense obligation, the insured has suffered an actual loss that is quantified after the insured retains counsel and begins receiving statements for legal services. These statements or invoices are the last piece of information needed to put a value on the insured's loss.'" *Id.* The Court held, therefore, that the insured's right to reasonable attorney's fees and eighteen percent statutory interest rate specified by the statute matures when, following receipt of this information, the insurer fails to pay within the statutory deadline. *Id.*

In this case, however, unlike in *Lamar Homes*, the insured (i.e., Devonshire) suffered an actual loss when its property was damaged by a wind and hail storm on May 24, 2011. Devonshire submitted a claim for this loss the next day and American acknowledged receipt of this claim on the same. Docs. 17, Am. Compl. ¶ 5; 33, Am. Answer ¶ 5. At this point, American had the opportunity to request from Devonshire "all additional items, statements, or forms" that it "reasonably

---

[20] Under certain liability policies, an insurer has a duty to defend the insured against suit.

believe[d]" it would need to process Devonshire's claim. *See* Tex. Ins. Code § 542.055(a). By failing to request any such information within the statutory deadline imposed by Section 542.055, American indicated that, as of the date it received Devonshire's claim, it had "all items, statements, and forms required by the insurer to require proof of loss" and waived the right to make additional requests during its investigation. *See AMJ Invs.*, 2014 WL 2895003, at *12–*13; *Cox Operating*, 2014 WL 109397, at *3; *Phil. Indem.*, 2011 WL 1100218, at *3. According to the logic of *Lamar Homes*, therefore, American had 15 business days from the date it received notice of Devonshire's claim to notify Devonshire of its acceptance or rejection of the claim and 60 days to pay it.

Moreover, despite American's assertion to the contrary, the Court can find no authority to warrant tolling the accrual of statutory interest under Section 542.060 for any duration of this period due to delays caused by Devonshire.[21]

Finally, though both parties devote a significant amount of their briefing to the issue of whether statutory interest was tolled during the appraisal of Devonshire's supplemental claim for damage to the carports, gutters, and downspouts, the Court need not reach this question because Devonshire has not pleaded a claim for statutory interest under Chapter 542 for American's failure

---

[21] In its response, American contends that "Chapter 542 interest is tolled during periods of delay caused by the plaintiff." Doc. 97, Def.'s Resp. Br. 7 (citing *Allison v. Fire Ins. Exch.*, 98 S.W.3d 227, 264 (Tex. App.—Austin 2003, pet. granted, judgment vacated w.r.m.)). *Allison*, however, does not stand for the broad proposition of law that American attributes to it. In *Allison*, an insured sued an insurer for statutory interest under the TPPCA for the insurer's failure to timely pay its claim. *Id.* at 263. Although the court found that the insurer had violated the TPPCA's prompt-payment provision, it decided to partially toll the accrual of interest due to the delay caused by the insured's rejection of an earlier payment made by the insurer; the insured having accepted payment for the exact same amount at a subsequent date. *Id.* at 264. Thus, *Allison* stands for the much narrower proposition that interest is tolled for periods of delay caused by the insured's bad faith refusal to accept payment of its claim from the insurer. Since there is no evidence that Devonshire rejected any of American's payments, there are no grounds for tolling the accrual of statutory interest in this case.

to timely pay this claim. *See S. Constructors Group v. Dynalectric Co.*, 2 F.3d 606, 609–10 (5th Cir. 1993) (concluding that theories of liability not pleaded are waived); *cf. Cutrera v. Bd. of Sup'rs of Louisiana State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) ("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court.").

Accordingly, the Court grants Devonshire's request for summary judgment on its claim for statutory interest and attorney's fees under the TPPCA. Without additional briefing, however, the Court is not prepared at this time to calculate the amount of statutory interest or attorney's fees owed Devonshire under Section 542.060.

## IV.

## CONCLUSION

For the reasons stated above, Defendant American Insurance Company's Motion for Partial Summary Judgment is hereby **GRANTED** and Plaintiff Devonshire Real Estate & Asset Management, LP's Motion for Partial Summary Judgment is **GRANTED in part**, and **DENIED in part**.

The only surviving claims are Devonshire's claims for breach of contract and for violations of the TPPCA. The Court cannot decide liability or calculate damages for the former, however, until the amounts of American's prior payments on Devonshire's supplemental claim for damage to the carports, gutters, and downspouts and American's overpayment of Devonshire's claim for damage to the ice and water shield are determined. The parties are therefore directed to brief the court on the proper calculation of these amounts. The parties are also ordered to brief the Court on the amount of statutory interest and attorney's fees owed Devonshire under Section 542.060 of the

TPPCA.

SO ORDERED.

SIGNED: September 29, 2014.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE